UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
UNITED STATES OF AMERICA

- against -

DIMITRY SHTEYMAN,
ALEKSEY SHTEYMAN,
MAXSIM SHVEDKIN,
ILYA GERSHOVICH,
PELAGEYA KOTELSKY, et al.
                              Defendants.
-----------------------------------------------------X

10 CR 347 (SJ)

<u>MEMORANDUM
AND ORDER</u>

A P P E A R A N C E S:

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK
271 Cadman Plaza East
Brooklyn, NY 11201
By:     Katherine Houston
         Steven J. Kim
Assistant United States Attorneys
Attorney for the Government

UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL FRAUD SECTION
1301 New York Avenue, NW
Washington, DC 20530
By:     O. Benton Curtis, III
Assistant United States Attorney
Attorney for the Government

ARNOLD NEIL KRISS, ESQ.
123 William Street, 22nd Floor
New York, NY 10038-3804
By:     Arnold Neil Kriss
Attorney for Defendant Dimitry Shteyman

LAW OFFICE OF MARTIN J. SIEGEL
170 Broadway, Suite 600
New York, NY 10038
By:     Martin J. Siegel
Attorney for Defendant Dmitry Shteyman

WINOGRAD & WINOGRAD, P.C.
450 Seventh Avenue, Suite 1308
New York, NY 10123
By:     Joel Winograd
Attorney for Defendant Aleksey Shteyman

ALLEN LASHLEY, ESQ.
16 Court Street, Room 1210
Brooklyn, NY 11241
By:     Allen Lashley
Attorney for Defendant Maxsim Shvedkin

DOAR RIECK & MACK
217 Broadway, Suite 707
New York, NY 10007
By:     John F. Kaley
Attorney for Defendant Ilya Gershkovich

KELLEY J. SHARKEY, ESQ.
26 Court Street, Suite 1016
Brooklyn, NY 11242
By:     Kelley J. Sharkey
Attorney for Defendant Pelageya Kotelsky

RICHARD E. KWASNIK, ESQ.
2170 Maple Avenue
Cortland Manor, NY 10567
By:     Richard E. Kwasnik
Attorney for Defendant Vladimir Rubin

JOHNSON, Senior District Judge:

The ten defendants in this action have been indicted for allegedly participating in a Medicare fraud scheme between January 2009 and April 2010. Presently before the Court are omnibus pretrial motions separately filed by certain defendants seeking bills of particulars, severances, suppression of statements, and further discovery. For the reasons set forth below, Defendants' motions are DENIED in part and GRANTED in part.

## BACKGROUND

### I. The Indictment

The operative indictment in this case, a second superseding indictment returned by the grand jury on November 12, 2010 (the "Indictment"), charges the ten defendants in this action with 19-counts of health care related fraud and conspiracy.[1] (See ECF No. 61.) The Indictment alleges that the fraudulent scheme operated out of a Medicare-certified Brooklyn-area purported provider of physical therapy and diagnostic testing known as Dr. Jesse A. Stoff Medical, P.C. d/b/a Solstice Wellness Center ("Solstice" or "the Center"). Solstice, according to the Indictment, submitted

---

[1] There have been three indictments in this case. The first one, returned on April 30, 2010, ran only against the three defendants the Court later described as Operator-Recruiter Defendants along with a fourth defendant who has since pleaded guilty. The Government thereafter filed its first superseding indictment on July 5, 2010.

fraudulent claims to Medicare, illegally billing Medicare for goods/services that were not medically necessary or were never even provided to beneficiaries.[2]

The ten defendants, as they are described in paragraphs 8 through 14 of the Indictment, may be classified as falling into three distinct categories of actors:

One category consists of defendants who managed and recruited beneficiaries into the alleged fraudulent scheme, but who are not themselves health care providers and/or Medicare beneficiaries ("Operator-Recruiter Defendants"). Three defendants fall in this category—Dmitry Shteyman ("Dmitry"), his brother Aleksey Shteyman ("Aleksey"), and Maxsim Shvedkin ("Shvedkin"). The bulk of the Indictment (Counts 1, 3–19) is directed against these defendants. It alleges that Dmitry was the Chief Operating Officer and Vice President of Solstice and managed the recruitment of Medicare beneficiaries at Solstice through the use of kickback payments to beneficiaries to induce them to allow Solstice to bill Medicare under their names for purported medical services. It further alleges that Aleksey was a consultant at Solstice and assisted in recruiting Medicare beneficiaries into the scheme, and that Shvedkin assisted in recruiting beneficiaries into the scheme. More specifically, Count 1 charge

---

[2] As paragraphs 1 through 6 of the Indictment explains, Medicare is a federal health care program providing benefits to persons over 65 or the disabled. It is administered by Centers for Medicare and Medicaid Services ("CMS"), an agency within the Department of Health and Human Services ("HHS"). Individuals who receive benefits under Medicare are referred to as "beneficiaries." Medicare-certified providers are assigned a unique PIN number for billing purposes and must use this PIN when submitting a bill for payment or a claim for reimbursement to the Medicare contractor or carrier assigned to that provider's state. The claim, which can be submitted electronically or in writing through Form CMS-1500 or UB-92, has to include information identifying the provider, the Medicare beneficiary and the services rendered. By submitting the claim, the provider certifies, among other things, that the services rendered to the beneficiary were medically necessary.

the Operator-Recruiter Defendants with conspiracy to defraud the United States and to have submitted and caused the submission of fraudulent claims to the Medicare program, in violation of 18 U.S.C. §§ 371 and 3551 et seq. In terms of overt acts, Count 1 alleges that the three men offered and paid cash kickbacks to a John Doe ("Doe") beneficiary to induce him to both visit Solstice on his own account and to refer other Medicare beneficiaries to the Center. It lists specific dates on which these Defendants allegedly offered and made kickback payments to Doe and the dates of the services Solstice fraudulently billed to Medicare on behalf of Doe. The Indictment further charge the Operator-Recruiter Defendants with conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1349 and 3551 et seq. (Count 3) and with health care fraud, in violation of 18 U.S.C. §§ 1347, 2 and 3551 et seq. (Counts 4–19). In terms of overt acts, the Indictment provides a table sample of allegedly fraudulent claims Solstice submitted to Medicare for 19 patients, which includes the approximate date of claim, claim amount, date of service and services billed. Finally, the Indictment contains a criminal forfeiture allegation seeking forfeiture of property obtained through the fraudulent scheme alleged in Count 1, and 3–19.

A second category consists of defendants who are Medicare beneficiaries charged with soliciting and receiving kickbacks in exchange for allowing Solstice to bill Medicare under their names as well as with recruiting other beneficiaries into the scheme (the "Beneficiary-Recruiter Defendants"). Two defendants fall in this category—Ilya Gershkovich ("Gershkovich") and Pelageya Kotelsky ("Kotelsky").

Finally, the third category of defendants consists of Medicare beneficiaries who are charged only with soliciting and receiving cash kickbacks to participate in the alleged scheme ("Beneficiary Defendants"). Five defendants fall into this category, including Vladimir Rubin ("Rubin").[3] Count 2 of the Indictment is the sole count that is directed at all three categories of Defendants, charging all ten with conspiracy to pay and receive healthcare kickbacks, in violation of 18 U.S.C. §§ 371 and 3551.

## II. Defendants' Pretrial Motions

Four Defendants have filed omnibus pretrial motions seeking bills of particulars, various items of pre-trial discovery, severance and suppression of statements, all of which are opposed by the Government.[4] Specifically:

---

[3] The Court notes that although it finds it useful as an organizing principle to talk of defendants as falling into three (3) separate categories, it previously sua sponte severed the trial of the ten defendants into two (2) groups of five, on efficiency grounds. See United States v. Namachie, 101 F. Supp. 2d 134, 151–152 (S.D.N.Y 2000) (discussing a district court's inherent discretion to sua sponte sever a trial in the interest of efficient judicial administration, and listing cases). The first trial is set to commence on July 11, 2011, and the first group of defendants who will proceed are those the Court herein describes as the Operator-Recruiter Defendants and the Beneficiary-Recruiter Defendants (the "Group 1 Trial"). The second trial is set to commence in October and the defendants who will proceed then are the Defendants the Court herein describes as the Beneficiary Defendants (the "Group 2 Trial"); defendant Rubin is the only one in that group who has filed any pretrial motions.

[4] Dmitry is the only Operator-Recruiter Defendant who has properly filed pretrial motions. His brother Aleksey did not file any pretrial motions, and his co-defendant Shvedkin submitted a perfunctory notice of an omnibus motion in lieu of any actual briefing, seeking: (1) general discovery pursuant to Rule 16, (2) a bill of particulars pursuant to Rule 7(f), and (3) a motion to suppress as-of-yet unidentified statements and evidence; or in the alternative, (4) a hearing pursuant to Rule 12(b)(3) to determine whether such statements and evidence exists. To the extent that Shvedkin's notice of motion could be construed as a request for relief, the Court denies it in its entirety for all the reasons stated in the Government's opposition brief. (See Gov't's Mem. in Opp'n to Shvedkin's Motions, ECF No. 95.) This Mem. and Order does not further address any pretrial issue pertaining to Shvedkin, except to the extent that Shvedkin stated his intent to join in the motions of his co-defendants.

- Dmitry, Gershkovich, Kotelsky, and Rubin have moved for bills of particulars pursuant to Federal Rule of Criminal Procedure ("Rule") 7(f).
- Gershkovich, Kotelsky, and Rubin also seek further forms of discovery, including <u>Brady</u> material, and Federal Rule of Evidence ("FRE") 404(b) material, and a witness list. Rubin also seeks a hearing on the FRE 404(b) issue.
- Gershkovich and Rubin seek severance.
- Gershkovich and Kotelsky seek to suppress certain post-arrest statements and requested a suppression hearing.
- And finally, Gershkovich, Kotelsky, and Rubin all join in the motions of their co-defendants to the extent such action is beneficial.

For purposes of clarity, to the extent defendants seek common elements the Court will describe them in turn and consider them together. Requests that are unique to the moving defendant will be considered separately.[5]

## DISCUSSION

## I.     Bills of Particulars

### A.  Governing Standard

Federal district courts have the authority to "direct the government to file a bill of particulars." FED. R. CRIM. P. 7(F). The district court has broad discretion in deciding whether to grant a motion for a bill of particulars. <u>United States v. Walsh</u>, 194 F.3d 37, 47 (2d Cir. 1999); <u>United States v. Panza</u>, 750 F.2d 1141, 1148 (2d Cir. 1984). A bill of particulars may be appropriate "where the charges of an indictment are so general that they do not advise the defendant of the specific acts of which he is accused." <u>Walsh</u>, 194 F.3d at 47. The purpose of a true bill of particulars is three-fold:   to

---

[5] This Mem. and Order addresses only the pretrial motions of defendants in the Group 1 Trial. The Court reserves decision on Rubin's requests, who is the only defendant from the Group 2 Trial to have filed any pretrial motions, until a time closer to the Group 2 Trial in October.

provide a defendant the necessary facts that would allow him "[1] to prepare for trial, [2] to prevent surprise, and [3] to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). The defendant bears the burden of showing "the information sought is necessary," and that he will be prejudiced without it. United States v. Fruchter, 104 F.Supp. 2d 289, 312 (S.D.N.Y. 2000).

In cases involving fraud, as is alleged here, a bill of particulars may be appropriate where the indictment does not identify the specific documents and transactions the Government contends are fraudulent. See Bortnovsky, 820 F.2d at 574–75 (reversing the denial of a bill of particulars in an insurance fraud case where government failed to identify which insurance claims were falsified) and United States v. Namachie, 91 F. Supp. 2d 565, 567 (S.D.N.Y. 2000), aff'd, 211 Fed. Appx 76 (2d Cir. 2007) (producing "mountains of documents" to the defense without specifying which documents are falsified will not obviate the need for a bill of particulars where the indictment is not specific). However, further pre-trial disclosure may vitiate the need for a bill "where the government has made sufficient disclosures concerning its evidence and witnesses by other means." United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004) (quoting Walsh, 194 F.3d at 47); see also Bortnovsky, 820 F.2d at 574 ("If the information sought by defendant is provided in some acceptable alternate form and/or further discovery by the Government, no bill of particulars is required.")

In short, a defendant is not entitled to preview, via a motion for bill of particulars, an extended trailer of the feature the Government plans to screen for the jury well in advance of the premiere.  See, e.g., United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) ("Acquisition of evidentiary detail is not the function of the bill of particulars") (quotation marks and citations omitted); United States v. Sindone, No. 01 CR. 517 (MBM), 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14, 2002) (a bill of particulars is not appropriate for use as a general pre-trial investigative tool for the defense);  Fruchter, 104 F. Supp. 2d at 311–12 (a bill of particulars is not appropriate as a device to compel the Government to disclose the manner in which it will attempt to prove its charges); United States v. Jimenez, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) (a bill of particulars is not appropriate as a tool to foreclose the Government from using proof it may develop as the trial approaches).

Here, in evaluating Defendants' specific requests for bills of particulars, the Court notes that the Government has indicated that it has disclosed and/or made available the vast majority of the evidence in its possession that it intends to introduce at trial during its case-in-chief.  Thus, while the Indictment itself is not necessarily chock-full of evidentiary details, Defendants have also received a significant amount of disclosure including, but not limited to, 39 boxes of documents that were seized at Solstice; CDs of undercover videos and transcripts of same; bank and state corporate records; electronic Medicare claims data along with a "cheat sheet" or key to understanding the claims data; kickback ledgers; and, lastly, interview notes of several potential

witnesses.  (See Government Letter re: Summary of Discovery, dated 4/11/2011 ("Gov. 4/11/2011 Ltr."), ECF No. 112.)  As a general matter, then, Defendants appear to already have sufficient information to satisfy the three-fold purpose of a true bill of particulars, as discussed above.  With this background, the Court now addresses Defendants' specific requests below.

### B.  Dmitry's Motion for a Bill of Particulars

Dmitry, in his motion for a bill of particulars, seeks an order to compel the Government to identify and segregate, in the discovery it has already disclosed, the approximate calculation of losses that is attributable to the alleged scheme as opposed to claims that Solstice legitimately submitted.  (See Dmitry's Demand for a Bill of Particulars at 1, ECF No. 90.)  He maintains that contrary to the Government's claim that the loss attributable to the alleged scheme is approximately $3.5 million, "the prosecution can only point to a handful of questionable situations that do not account for more than a few hundred dollars."  (See id. at 4.)  Thus, unless the Government intends to proceed on a theory that every dollar Solstice derived is the result of criminal activity, he asserts, the Court should grant a bill of particulars to avoid a "sound and light show" for the jury, whereby the Government would ask the jury to infer that all of Solstice's revenues were illicit proceeds.  (See id. at 3.)

In light of the fact that the sum total of the sample fraudulent claims the Indictment lists amounts to just $4,465, by the Court's calculation, Dmitry's desire for more information concerning the alleged $3.5 million loss is understandable.  Dmitry's legal

arguments, however, are without merit.  As an initial matter under the principles set forth above, Dmitry is not entitled to discovery on the manner in which the Government will attempt to prove the alleged $3.5 million loss.  See United States v. Albunio, No. CR-91-0403(S-2), 1992 WL 281037, at *2 (E.D.N.Y. Sept. 9, 1992) (a "defendant's right to know the crime with which he is charged must be distinguished from his right to know the evidentiary details by which proof of his culpability will be established.")  Second, as the Government correctly points out, loss calculation, though relevant to sentencing and possible restitution, is not among the elements necessary to establish a violation of any of the statutes with which Dmitry is charged.[6]  Finally, the request is moot pursuant to Dmitry's own concession that a bill of particulars would only be necessary "if the prosecution is not contending or arguing that every last penny collected or billed by [Solstice] are criminal proceeds. . . ."  (See  Dmitry's Demand for a Bill of Particulars at 2.)  Here, the Government has stated that it is its position that

---

[6] By way of example, below are some of the statutes Dmitry is charged with violating along with the essential elements of proof:

- The false claims statute, 18 U.S.C. § 287, requires the Government to prove: (i) Dmitry knowingly made or presented a claim to CMS, a federal agency under HHS; (ii) the claim which was made or presented was a claim against CMS/HHS, and (iii) Dmitry presented the claim knowing that it was false, fictitious or fraudulent as to a material fact.  See L. Sand, et al., Modern Federal Jury Instructions ¶ 18.5, Inst. 18–3;

- The general conspiracy to violate federal law statute, 18 U.S.C. § 371, requires the Government to prove (i) Dmitry and others entered into the unlawful agreement charged in the indictment starting on or about January 2009 to April 2010, (ii) that he knowingly and willfully become a member of the conspiracy, and (iii) that one of the members of the conspiracy knowingly committed at least one of the over acts charged in the conspiracy, (iv) in furtherance of the conspiracy.  See id. ¶ 19.7, Inst. 19–3; and

- The health care fraud statute 18 U.S.C. § 1347, requires the Government to prove: (i) that there was a scheme to defraud, (ii) that Dmitry knowingly and willfully executed or attempted to execute that scheme with the intent to defraud,  and  (iii) that the target of the scheme was a health care benefit program.  See id. ¶ 44.67, Inst. 44–14

Solstice's only business was to bilk the Medicare Program.[7] Accordingly, Dmitry's motion for a bill of particulars is DENIED.

## C. Gershkovich's Requests for Bills of Particulars

Gershkovich seeks the following particulars on the Rule 16 discovery the Government has already provided: (1) the identity of the patients he is charged with recruiting, including the only one specifically alleged in the Indictment as John Doe; (2) the medical treatment the patient(s) allegedly received; (3) an explanation of how the treatment ran afoul of the law—i.e. whether treatment was not medically necessary or not rendered at all; and (4) Medicare claim documents reflecting the billing of such treatment to Medicare. He also seeks greater specificity as to the dates within the 16–month period he alledgedly (5) recruited patient(s) and paid a cash kickback; and (6) solicited and received a cash kickback. Finally, he seeks greater specificity as to (7) how the concomitant medical treatment he received when he visited Solstice as a beneficiary ran afoul of the law. (See generally Gershkovich's Request for Particulars at Ex. C, ECF No. 93.)

_____

[7] The Government first advised Defendants of this position at a status conference on February 3, 2011, and later at a conference on April 5, 2011. The Government reemphasized this position in a separate letter to the Court, long after these pretrial motions were briefed, summarizing its disclosure to date. ("Gov. 4/11/10 Ltr.") Significantly, with respect to a possible basis for the Government's claim, the Government also disclosed to Defendants a report from a nurse working for the Medicare contractor assigned to New York, on behalf of CMS. The report, based on a study of a representative sample of claims Solstice submitted to Medicare for 35 of its patients, concludes that approximately 98% percent of the sample claims were inappropriate.

With respect to Gershkovich's requests Nos. (1) and (4), the Government has already disclosed the names of beneficiaries Gershkovich allegedly recruited. (See Gov. 4/11/2011 Ltr. and attached email dated 4/6/2011). With respect to requests Nos. (5) and (6), the Government is not required to prove, never mind provide ahead of trial, exactly when a conspiracy was formed or exactly when a particular defendant joined the alleged scheme. United States v. Matos-Peralta, 691 F. Supp. 780, 791 (S.D.N.Y 1988). Furthermore, these requests amount to a "when" of the charged conspiracy, and courts have routinely held that the "wheres, whens and with whoms" of a charged offense are beyond the proper scope of a bill of particulars. United States v. Rivera, No. 09-CR-619 (SJF), 2011 WL 1429125, at *8 (E.D.N.Y. Apr. 13, 2011); see also Chen, 378 F.3d 151 at 163 (upholding the denial of a bill of particulars as to the "exact time and place of each alleged act associated with each offense in identified in the indictment").

Additionally, concerning Gershkovich's request for greater specificity as to when within the 16-month period he recruited patients, this Circuit consistently sustains wide latitude with date ranges within the indictment where the indictment, as is the case here, tracks the language of the statutes defendants are charged with violating. See generally Walsh, 194 F.3d at 44–45. Finally, it is well-settled that "there is no general requirement that the Government disclose in a bill of particulars all the overt acts it will prove in a conspiracy charge." Namachie, 91 F. Supp. 2d at 575 (quotation marks and

citations omitted); see also United States v. Jimenez, 824 F. Supp. 351, 363 (S.D.N.Y 1993). Accordingly, Gershkovich's requests Nos. 1, 2, 4, 5, and 6 are DENIED.

Gershkovich's requests Nos. (3) and (7), which essentially demand greater specificity concerning how the claims Gershkovich may be held criminally responsible for were fraudulent, are GRANTED. The Indictment alleges that all of the claims Solstice submitted to Medicare were fraudulent because they were for medical treatment not provided and not medically necessary. (See Indictment at ¶¶ 13, 17(d), ECF No. 61) (emphasis added.) Such an allegation does not apprise Gershkovich with sufficient precision as to enable him to prepare a defense and avoid unfair surprise at trial. See Namachie, 91 F. Supp. at 574 (a Medicare fraud case granting a similar request for a bill of particulars where the Government failed to specify the ways in which the allegedly fraudulent claims were false).

**D. Kotelsky's Requests for Bills of Particulars**

Kotelsky maintains that while the Government has provided an enormous amount of discovery, much of it concerns Medicare claims billing data and medical diagnosis and, as such, is highly technical. (See Kotelsky's Aff. and Mem. of Law in Support of Her Motions at 1, ECF No. 89.) Kotelsky seeks further clarification of this discovery and moves for the following particulars: (1) the commercial billing system used to generate the claims data and (2) an explanation of the columns and acronyms in the data. She further requests that the Government identifies for each beneficiary she is alleged to have recruited as well for the claims Solstice submitted to Medicare on her

behalf as a beneficiary (3) the specific visit/file/entry that is allegedly fraudulent as noted in the billing and medical records. (See id. at 5–6.)

With respect to Kotelsky's requests Nos. (1), (2) and (3), the Government has already provided this information. (See Gov. 4/11/2011 Ltr., attached email dated 4/7/2011, and attached letter dated 11/23/2010.) This disclosure coupled with the Government's position that all claims submitted by Solstice were fraudulent makes this request redundant. Accordingly, Kotelsky's request for a bill of particulars is DENIED in its entirety. However, to the extent that she joined in her co-defendant Gershkovich's motion, the Government should similarly provide her with the specifics on how the claims she may be held criminally responsible were fraudulent—i.e. whether the medical services were not medically necessary or whether they weren't provided at all.

## II.      Further Disclosure Issues

Gershkovich and Kotelsky also seek disclosure of all evidence of prior bad acts or other crimes that the Government intends to use it its case-in-chief, pursuant to FRE 404(b). Dmitry joins the three in requesting all materials discoverable under Brady v. Maryland, 373 U.S. 83 (1963). Additionally, Kotelsky requests disclosure of the identities of unindicted co-conspirators as well statements of all conspirators; and Gershkovich also requests a witness list 30 days in advance of trial.

The Government, in its opposition to these motions, states that it provided initial and supplemental discovery responses, and that it furnished the bulk of the

evidence in its possession that it intends to introduce at trial as early as July 2010. The Government also maintains that its pre-trial disclosure to date is substantial. Nevertheless, in the interest of managing the Group 1 Trial that is fast approaching, the Court has exercised its discretion to grant certain of Defendants' request. In addressing the various issues Defendants raise here, the Court finds Namachie, a Medicare fraud case that addresses several of the issues Defendants raise here, directly on point. See generally Namachie, 91 F. Supp. 2d 565. For the reasons explained more fully below, Defendants' additional requests for disclosure DENIED in part and GRANTED in part.

### A. FRE 404(b) Material

Pursuant to Rule 16(a)(1)(C), Defendants request disclosure of any and all evidence of "other crimes, wrongs, or acts" that the Government intends to introduce against each defendant under Rule 404(b). FRE 404(b) provides that prior act evidence "is not admissible to prove the character of a person in order to show action in conformity therewith," but may be admissible for other purposes, "such as proof of motion, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident"). FED. R. EVID. (404)(b). FRE 404 requires that the defendant be given "reasonable notice in advance of trial or during trial if the court excuses pretrial notice on good cause shown," but does not define "reasonable." It is therefore left to the Court to give meaning to that term in each particular case. The Court in Namachie observed that notice of intent to use Rule 404(b) evidence is typically provided no more than two or three weeks before trial. Namachie, 91 F. Supp. at 576–77; see also

United States v Ojeikere, 299 F. Supp. 2d 254, 247 (S.D.N.Y. 2004) (observing that "[c]ourts in this Circuit have routinely found that at least 10 business days provides reasonable notice to a defendant under Rule 404(b)," and collecting cases); United States v. Lily, No. 94 CR 705 (LMM), 1995 WL 20271, at *1 (S.D.N.Y Jan 19, 1995) (ordering the government to turn over Rule 404(b) materials 15 days before trial). Here, the Government argues that the request is premature and states that it will provide Defendants with such material "a later, appropriate time." While 10 days is sufficient to provide defendants with reasonable notice, see Ojeikere, 299 F. Supp. 2d at 247, the Court directs the Government—in light of the fact that five Defendants will be on trial at the same time and the trial date is fast approaching—to advise all the Group 1 Trial Defendants of the relevant FRE 404(b) material no later than 21 days prior to trial. This will not only provide Defendants with adequate opportunity to prepare and/or move to preclude the introduction of such evidence, but will also provide the Court with adequate time to rule on any such motions prior to voir dire.

**B. Brady Material**

Defendants request that the Government disclose all materials potentially favorable to Defendants, including information concerning claims that were for medical services that were both provided and medically necessary, as required under Brady. Brady material includes all evidence that may be favorable to a defendant and material to the issue of guilt and/or punishment. See Brady v. Maryland, 373 U.S. 83, 87 (1963); see also United States v. Rivas, 377 F.3d 195,199–200 (2d Cir. 2004). The Government, in

its opposition, assures the Court that it is aware of its <u>Brady</u> obligations, and that it has complied with this obligation to date. Significantly, the Government states that it has already provided defendants with all the information, exculpatory or not, in its possession that it intends to introduce during its case-in-chief. Based on this representation, the Court is satisfied that the Government understands its <u>Brady</u> obligations and declines to grant Defendants any relief on these requests. <u>See</u> <u>United States v. Underwood</u>, No. 04 CR 424 (RWS), 2005 WL 927012, at *1 (S.D.N.Y. Apr. 21, 2005) (observing that the courts in this Circuit have repeatedly found such assurances sufficient to deny defendants' pretrial requests for <u>Brady</u> material); <u>see also</u> <u>United States v. Galestro</u>, No. 06-CR-285 (ARR), 2008 WL 2783360, at *18 (E.D.N.Y July 15, 2008) (observing that "it is neither feasible nor desirable for courts to specify the extent of timing of <u>Brady</u> disclosures," and "therefore courts [must] rely on the prosecution to scrupulously honor its obligations under Brady. . . .") (citations omitted). The Court reminds the Government, however, out of an abundance of caution, of its continuing obligation under <u>Brady</u> to disclose any such material prior to trial and to do so with sufficient time for defendants to have a fair opportunity to use it at trial. <u>See, e.g.</u>, <u>United States v. Douglas</u>, 525 F.3d 225, 245 (2d Cir. 2008) (while the Government is not required to provide <u>Brady</u> materials upon request, it is required to disclose such materials "in time for its effective use at trial.") (citations omitted); <u>United States v. Nanfro</u>, No. 92 CR 61 (RPP), 1992 WL 30987, at *10 (S.D.N.Y. Oct. 14, 1992) (directing the Government to inform the Court and defense counsel at the

time of jury selection as to whether it has failed to disclose any <u>Brady</u> material to the defendants).

### C. The Identity and Concomitant Statements of Unindicted Co-Conspirators

Kotelsky requests, pursuant Rule 16 and separate from her motion for a bill of particulars, (a) the names of unindicted co-conspirators as well as (b) any statements by such parties. (<u>See</u> Kotelsky's Aff. and Mem. of Law at 2, requests I.4 and I.5, ECF No. 89.) The Government counters that this request should be denied as moot because it has not yet "definitively" identified unindicted co-conspirators as the trial was which, at the time of its response, was some four months away.

The determination of whether to compel the Government to provide a defendant with the identities of unindicted co-conspirators, whether or not they will be called as witnesses, is well within the discretion of the district court. <u>Nachamie</u>, 91 F. Supp. 2d at 572 (noting that the Second Circuit has affirmed both the grant and the denial of such requests). In determining whether to grant such requests, courts have considered the following factors:

> (1) the number of co-conspirators;
> (2) the duration and breadth of the alleged conspiracy;
> (3) whether the Government has otherwise provided adequate notice of the particulars;
> (4) the volume of pre-trial disclosures;
> (5) the potential danger to co-conspirators; and
> (6) the potential harm to the Government's investigation.

<u>United States v. Savin</u>, No. 00 CR 45 (RWS), 2001 WL 243533, at *5 (S.D.N.Y. Mar. 7, 2001) (quoting <u>Namachie</u>, 91 F. Supp. 2d at 572).

Here the Court finds that, on the one hand, that Kotelsky is charged in a multi-defendant case with several co-conspirators and the Government has not expressed any concern that disclosing the identity of any unindicted co-conspirators would place such individuals in peril or otherwise harm its investigation. On the other hand, the Court also finds, Kotelsky has been provided with sufficient information on the charges she faces—both through the indictment as well as through pre-trial disclosure, which does not appear overly burdensome. Balancing similar facts, the court in <u>Namachie</u> exercised its discretion to compel disclosure in part because the Government produced over "200,000 pieces of paper, demonstrating a need for the production of the names of unindicted co-conspirators in order to prevent unfair surprise and enable defendants to prepare for trial." <u>Namachie</u>, 91 F. Supp. 2d at 573. Such voluminous disclosure is not at issue here. Accordingly, Kotelsky's motion for a list of unindicted co-conspirators is thus DENIED.

Kotelsky's request for the production of statements of co-conspirators is similarly denied. The Jencks Act prohibits the required disclosure of statements in the possession of the Government before the witness testifies on direct examination. <u>See</u> 18 U.S.C § 3500; <u>see also</u> <u>United States v. Marquez</u>, No. 91 CR 451 (SWK), 1992 WL 88139, at *6 (S.D.N.Y. Apr. 22, 1992) (Rule 16(a)(2) "explicitly provides that Rule 16 does not authorize the discovery of such statements, and pursuant to 18 U.S.C. § 3500, a district court cannot order the disclosure of such statements before their direct testimony at trial") (citations omitted). The Court further notes that in any event the

Government had indicated it has already disclosed to Defendants interview summaries of possible cooperating witnesses in the Government's case-in-chief and a consensual recording. (See Gov. Ltr. 4/11/2011.)

### D. Disclosure of the Government's Witness List

Gershkovich seeks a witness list 30 days prior to trial. The Government resists disclosure on the ground that Rule 16 does not obligate them to disclose the identities of its witnesses before trial, and that, as a practical matter, a witness list would be overly exhaustive and inaccurate. As a general rule, the Government is not under any obligation to disclose the identities of witnesses well in advance of trial. See Fed. R. CRIM. P. 16; United States v. Saa, 859 F.2d 1067, 1073 (2d Cir. 1998). However, the Court has the discretion to compel the pre-trial disclosure of Government's witnesses where the defense makes a sufficient showing for the need for such information. United States v. Cannone, 528 F.2d 296, 298–300 (2d Cir. 1975); see also Nachamie, 91 F. Supp. 2d at 579. Moreover, here with the trial date some 45 days away it is not too early for the Court to make such a determination. The test for determining whether it is appropriate to exercise that discretion is whether "a specific showing of need for disclosure" outweighs "a specific showing of need for concealment by the government." Cannone, 528 F.2d at 301. As Gershkovich correctly points out, courts have looked to the six factors the Southern District outlined in United States v.

Turkish, 458 F. Supp. 874, 881 (S.D.N.Y. 1978) to determine whether a defendant can establish need.[8] The relevant query under Turkish is:

1) Did the offense alleged in the indictment involve a crime of violence?
2) Have the defendants been arrested or convicted for crimes involving violence?
3) Will the evidence in the case largely consist of testimony relating to documents (which by their very nature are not easily altered)?
4) Is there is a realistic possibility that supplying the witnesses' names prior to trial will increase the likelihood that the prosecution witnesses will not appear at trial or will be unwilling to testify at trial?
5) Does the indictment allege offenses occurring over an extended period of time, making preparation of the defendants' defense complex and difficult?
6) Do defendants have limited funds with which to investigate and prepare their defense?

Turkish, 458 F. Supp. at 881. The Court finds all of these factors, which the Government does not otherwise address, have been satisfied in this case. First, this case alleges health care fraud conspiracy in which violence is not an issue, hence the concerns outlined in factors 1 through 4 are not implicated. Second, although Court has some reservations as to whether, per factor 5, this matter would be overwhelmingly complex or difficult, cases applying Turkish have found this factor met where the alleged fraud has taken place for the approximate duration alleged here. See United States v. Shoher, 555 F. Supp. 346, 354 (S.D.N.Y. 1983) (mail and wire fraud taking place over seventeen-month period); Turkish, 458 F. Supp. at 881 (tax fraud taking place over a fifteen-month period). Finally, with respect to the last factor, that Gershkovich is of limited funds is not in controversy: he has a court-appointed lawyer

---

[8] See, e.g., United States v. Solomonyan, 451 F. Supp. 2d 626, 644 (S.D.N.Y. 2006) (collecting cases applying the Turkish factors); United States v. Savin, 00 CR 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) (applying the Turkish factors); Nachamie, 91 F.Supp.2d at 579 (same).

at a time when CJA funds are scarce. The Court thus concludes that Gershkovich has made "'a specific showing of need outweighing the [G]overnment's fear of danger from disclosure.'" Nachamie, 91 F. Supp. 2d at 579 (quoting Turkish, 458 F. Supp. at 881). Compare United States v. Upton, 856 F. Supp. 727, 751 (E.D.N.Y. 1994) (concluding that where defendants have satisfied the factors outlined in Turkish, they "thus have established a particularized need for a witness list") with Saa, 859 F.2d at 1073 (recognizing that the government may be obligated to disclose the identities of witnesses prior to trial where the defendant has made a showing of need).

Accordingly, the Government is directed to provide all Defendants in the Group 1 Trial with a list of the names of those individuals the Government intends to call at trial. See Nachamie, 91 F. Supp.2d at 579 (ordering disclosure in Medicare fraud case after finding Turkish factors met). In order to ensure that defendants receive sufficient time to prepare their defense and to avoid unnecessary delays at trial, the Government is further directed to do so 14 days before trial, and to update this list as required. See id. (observing that courts that have directed the Government to produce its witness list have disagreed as to when, though requiring the Government to produce a witness list 14 days before trial).

As a final note on Defendants' various requests for further discovery, the Court rules that any request that is not specifically addressed above is DENIED.

### III.    Gershkovich's Motions for Severance

As the Court previously indicated, <u>supra</u> footnote 3, this case is already severed. Its ten defendants will be tried in two separate trials—the Group 1 Trial and the Group 2 Trial.   Nevertheless, invoking Rule 14, Gershkovich separately moves for further severance on the grounds of prejudicial spillover. Gershkovich also argues that a joint trial would deprive him of the exculpatory testimony of a co-defendant.   As matter of judicial economy, the Court finds further severance unnecessary.   Accordingly, along with the additional reasons outlined below, the Court DENIES the motion.

### A.  Standard for Relief from Prejudicial Joinder under Rule 14(a)

As an initial matter, the Court notes that Defendants are properly joined under Rule 8(b) because the charges against them in the Indictment contain overlapping participants and facts—they are all charged with the same conspiracy during the same time period with shared participants and a common scheme.[9]   Nevertheless, even where joinder is proper, Rule 14(a) allows a district court to grant severance or any other relief, if joinder appears to prejudice anyone.[10]   <u>See, e.g.</u>, <u>Zafiro v. United States</u>, 506 U.S. 534, 541 (1993); <u>United States v. Blout</u>, 291 F.3d 201, 209 (2d Cir. 2002).   The

---

[9] Rule 8(b) permits joinder when defendants are alleged, as is the case here, "to have participated in the same acts or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b); <u>see also</u> <u>United States v. Rittweger</u>, 524 F. 3d 171, 177 (2d Cir. 2008) (joinder of defendants is appropriate where the alleged criminal conduct is "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme"); <u>United States v. Turoff</u>, 853 F.2d 1037, 1042 (2d Cir. 1988) (joinder is particularly appropriate where defendants are charged with the same conspiracy and the evidence against them substantially overlaps).

[10] Rule 14(a) provides in pertinent part:

> If the joinder of offenses or defendants. . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim P. 14(a).

district court has broad discretion in deciding a severance motion pursuant to Rule 14(a).  See, e.g., United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998) (observing that the standard of review for reversing a district court's denial of a severance motion is the "extremely difficult burden of showing an abuse of discretion"); United States v. Cardascia, 951 F.2d 474, 483 (2d Cir. 1991) (noting that a district court's exercise of its discretion under Rule 14(a) is "virtually unreviewable" on appeal).

The defendant bears the heavy burden of showing that "substantial prejudice" would result from a joint trial with his co-defendants or that "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about his guilt or innocence." Zafiro, 506 U.S. at 539; see also United States v. Amato, 540 F.3d 152, 164 (2d Cir. 2008) (a district court will only be found to have abused its discretion in denying severance upon a showing of such prejudice as to constitute a miscarriage of justice).

### B.  Severance Based on the Spillover Effect

Gershkovich contends that this Court should grant a severance because he is charged in just one count of the 19-count indictment.  His alleged wrongdoing, he maintains, is limited as compared to that of the co-defendants who are charged with extensive health care fraud involving hundreds of patients, millions of dollars, and multitude of transactions.   Absent severance, he urges, he will suffer some prejudice based on the "spillover" effect of being lumped in with their respective co-defendants.

Undoubtedly the danger of prejudicial spillover in multiple-defendant trials is always present. However, the Second Circuit has held that some risk is acceptable given the judicial economies that result from joinder. United States v. Carpentier, 689 F.2d 21, 27 (2d Cir. 1982), cert. denied, 459 U.S. 1108 (1983). This Circuit has also held that "[d]ifferent levels of culpability and proof . . . inevitable in any multi-defendant trial . . . standing alone, are insufficient grounds for separate trials." United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir.), cert. denied, 488 U.S. 966 (1988). Thus severance is not necessary simply because the defendants' role in an alleged conspiracy varies in scope or importance. United States v. Aloi, 511 F.2d 585, 598 (2d Cir.), cert. denied, 423 U.S. 1015 (1975). Nor is it necessary merely because some of the evidence that will be offered at trial would be inadmissible against Gershkovich. See, e.g., United States v. Persico, 621 F. Supp. 842, 853 (S.D.N.Y. 1985).

Here, although Gershkovich's involvement in the charged health care fraud conspiracy is not alleged to be on the same scale as the Operator-Recruiter Defendants with whom he will be tried in the Group 1 Trial, Gershkovich is nonetheless charged, along with all of his co-defendants in Group 1, with conspiracy to commit health care fraud. It is well-settled that "differences in degree of guilt and possibly degree of notoriety" do not necessitate a severance. Aloi, 511 F.2d at 598.

In any event, the cure for the minimal risk of spillover at issue in both cases is a limiting instruction to the jury, rather than the discretionary remedy of severance pursuant to Rule 14(a). See Zafiro, 506 U.S. at 538–39 ("Rule 14(a) does not require

severance even if prejudice is shown; rather it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion").  This Circuit has consistently upheld the denial of severance motions in joint trials where the district court provided an appropriate limiting instruction to the jury and in instances where the movants faced an even greater risk of prejudicial spillover than Gershkovich and Rubin face here. See, e.g., United States v. Diaz, 176 F.3d 103, 104 (2d Cir. 1999); United States v. Hernandez, 85 F.3d 1023, 1029–30 (2d. Cir. 1996); United States v. Devillo, 983 F.2d 1185, 1192–93 (2d Cir. 1993); United States v. Carson, 702 F.2d 351, 367 (2d Cir. 1983).  Accordingly, this branch of Gershkovich's motion for discretionary severance is DENIED.  He may request a limiting instruction at the appropriate time, if it becomes necessary.  Notably, the Government, in its opposition papers, has indicated that it would readily consent such an instruction reminding the jury to assess the evidence against each defendant separately from the proof against the other defendants.

### C.  Severance Based on the Right to Purported Exculpatory Testimony

Gershkovich maintains that a joint trial would preclude him from calling his co-defendant Dmitry as an exculpatory witness given Dmitry's right to invoke the Fifth Amendment privilege against self-incrimination.   In support of this application, Gershkovich submits an affidavit by his own lawyer who writes that according to Dmitry's lawyer, though Dmitry will not take the stand at a joint trial, but he would be willing to testify in a separate trial that any payments Solstice extended to Gershkovich were for repayment of a loan Gershkovich previously made to Solstice.

The Second Circuit has provided a four-factor test to determine when purported exculpatory testimony from a co-defendant warrants severance: "(1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege; (2) the degree to which the exculpatory testimony would be cumulative; (3) the counter arguments of judicial economy; and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment." United States v. Finkelstein, 526 F.2d 517, 523-24 (2d Cir. 1975), cert. denied, 425 U.S. 960 (1976).

Gershkovich's application here falls far short of meeting Finkelstein's exacting standard. First, Gershkovich has not offered the Court good reasons to believe that Dmitry would in fact testify in a separate trial and waive his right of self-incrimination. Notably, Dmitry has not entered a guilty plea and has made no indication that he intends to plead guilty. See Finkelstein, 526 F.2d at 524 (observing that it would be "unrealistic to think a co-defendant would be willing to waive his constitutional privilege against self-incrimination when called as a witness at a separate trial than he would be willing to insist upon his privilege as a defendant not to take the stand") (citations omitted). In lieu of a supporting affidavit from Dmitry himself or even from Dmitry's counsel, Gershkovich submits only his own attorney's affidavit in support. The Court finds that this is insufficient under the circumstances. See United States v. Pirro, 76 F. Supp. 478, 482 (S.D.N.Y. 1999) (concluding that the failure to meet the first Finkelstein factor where there was no realistic possibility that a co-defendant would testify for the movant weighed particularly heavily against severance).

Gershkovich also fails to meet the second factor of the <u>Finkelstein</u> test because the alleged exculpatory information would be cumulative. As the Government correctly points out, there is nothing stopping Gershkovich himself from testifying to the specifics of the purported exculpatory testimony Dmitry would offer. <u>See</u> <u>United States v. Attanasio</u>, 870 F.2d 809, 815 n.3 (2d Cir. 1989) (deciding on other grounds, but noting that it would have affirmed a decision denying a motion for severance because the district court had appropriately found that the exculpatory testimony was available from other sources, and thus would have been cumulative); <u>Pirro</u>, 76 F.Supp. at 483 (concluding that where a co-defendant purported exculpatory testimony could be shown through other sources, the testimony was cumulative). Third, concerning judicial economy, the third factor of the <u>Finkelstein</u> test, previously noted, the Court has already severed this trial for purposes of judicial efficiency. It takes no mental calisthenics to see that the only reward for further slicing this case into even more trials is diminishing returns to efficiency, and a waste of judicial resources. <u>See</u> <u>Pirro</u>, 76 F. Supp. at 483–84 (discussing efficiency and the strong public policy for joint trials). Finally, concerning the last factor of the <u>Finkelstein</u> test, there is insufficient information, at this stage, to determine whether Dmitry's testimony would be subject to substantial damaging impeachment. However, even assuming <u>arguendo</u> that Gershkovich could meet this prong, it cannot earn him a passing mark in light of his failure to meet the balance of the <u>Finkelstein</u> test. Accordingly, this branch of Gershkovich's motion for discretionary severance is also DENIED.

### IV.    Kotelsky's and Gershkovich's Motions to Suppress

Kotelsky seeks to suppress statements she made during an interview at her home on June 9, 2010 (the "June 9 Interview") on the grounds that the interview was a custodial interrogation within the meaning of Miranda, without the benefit of her Miranda rights; as well as that her statements were involuntary.  (See Kotelsky's Attorney Aff. and Mem. of Law, ECF No. 89.)  The Government opposes, arguing Kotelsky was not in custody and thus her Miranda rights were not implicated; and, furthermore, her statements were voluntarily and not coerced.

Gershkovich seeks to suppress two sets of statement he made on the day he was arrested at his home on July 20, 2011:  (a) statements he made in the approximately four hours post-arrest but prior to being provided with Miranda warnings ("pre-Miranda statements"); and (b) statements he made later that day after he was advised of his Miranda rights and declined to sign a form waiving those rights ("post-Miranda statements").  (See Gershkovich's Attorney Aff. in Support of Pre-Trial Motions, Mem. of Law in Support, Reply Mem. of Law and ECF Nos. 93, 94, 105 respectively.) Gershkovich argues that the pre-Miranda statements should be suppressed because they are the products of un-Mirandized custodial interrogation and that the post-Miranda statements, should be suppressed because they occurred after he specifically refused to waive his Miranda rights and, as such, were not voluntary.  The Government opposes, arguing that Gershkovich was not subject to interrogation and thus Miranda is not implicated; and furthermore his statements were spontaneous and voluntary.

The Court held separate hearings on both motions. Below, following a recitation of the governing law, is the Court's respective fact findings and conclusions of law as to each defendant.

**A. Governing Law**

1. <u>The Miranda Warnings</u>

The Fifth Amendment bars the use of statements elicited as a product of custodial interrogation. <u>Miranda v. Arizona</u>, 384 U.S. 436, 467 (1966); [11] <u>see also</u> <u>United States v. Newton</u>, 369 F.3d 659, 668 (2d Cir. 2004), <u>cert. denied</u>, 543 U.S. 947 (2004). <u>Miranda</u> warnings are not required when a person is not in custody or is not interrogated by the law enforcement agents. <u>Illinois v. Perkins</u>, 496 U.S. 292, 297 (1990); <u>see also</u> <u>Newton</u>, 369 F.3d at 669.

Determining whether a person is in custody for <u>Miranda</u> purposes is an objective two-pronged inquiry that asks (1) "first what were the circumstances surrounding the interrogation; and second, given those circumstances, (2) would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave." <u>United States v. Badmus</u>, 325 F.3d 133, 138 (2d Cir. 2003) (internal quotation and citation omitted). <u>Accord</u> <u>United States v. Ali</u>, 86 F.3d 276, 276 (2d. Cir. 1996) (absent formal arrest, the relevant inquiry is "whether the law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused

---

[11] In <u>Miranda</u>, the Supreme Court held that "prior to questioning, the person must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him; and that he has the right to the presence of an attorney, either retained or appointed. <u>Miranda</u>, 384 U.S. at 444.

to leave.") Factors relevant in considering this totality of the circumstances test for custody, include "[1]whether a suspect is or is not told that she is free to leave; [2]the location and atmosphere of the [questioning]; [3]the language and tone used by the police; [4] whether the suspect is searched, frisked or patted down; and [5] the length of the interrogation." Tankleff v. Senkowski, 135 F.3d 235, 243–44 (2d Cir. 1998) (citations omitted).

Determining whether an individual was subject to interrogation for Miranda purposes looks to whether a person was subject to "express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300–01 (1980); see also Cruz v. Miller, 255 F.3d 77 (2d Cir. 2001). The "functional equivalent" of interrogation is "any words or actions. . . that the police should know are reasonably likely to elicit an incriminating response." Id. at 301; see also United States v. Rodriquez, 356 F3d 254, 258 (2d Cir. 2004) ("whether a defendant was subject to questioning or equivalent that provides 'a measure of compulsion above and beyond that inherent in custody itself.") "Unforeseeable incriminating responses to ordinary questions do not transmute an interview into an interrogation." United States v. Paracha, No. 03 CR 1197 (CHS), 2004 WL 1900336, at *5 (S.D.N.Y. Aug. 24, 2004).

2. Voluntary[12]

It is well settled that "any criminal trial use against a defendant of his

---

[12] Voluntariness is "interrelated, but analytically distinct" from the question of whether an individual was subject to custodial interrogation for purposes of Miranda. Tankleff v. Senkowski, 135 F.3d 235, 242 (2d Cir. 1998).

involuntary statement is a denial of due process of law." United States v. v. Kabba, 999 F.2d 47, 50 (2d Cir. 1993). In assessing whether a defendant's inculpatory statements were voluntary, courts must consider the totality of the circumstances under which the statements were made, Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1993), to determine whether law enforcement agents' rose to the level of "coercive and overbearing," United States v. Bye, 919 F.2d 6, 10 (2d Cir. 1990), "such as to overbear [the individual's] will to resist. . . ." Kabba, 999 F.2d at 51 (quotation and citations omitted). In making this determination, the Second Circuit has directed the courts to make specific findings on the totality of the circumstances, including: "[1] the defendant's background and experience, [2] the conditions of his interrogation, and [3] the conduct of the law enforcement officers." United States v. Rugles, 70 F.3d 262, 265 (2d Cir. 1995); accord United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991) (finding error where the district court failed to make "specific findings. . .that under the totality of the circumstances—considering the three factors—the defendant's will was overborne by the agent's conduct.")

    3.  <u>Burden of Proof</u>

      The Court notes that on a motion to suppress statements, it is the defendant who bears the burden of demonstrating that he was subject to custodial interrogation. United States v. Pena, 961 F.2d 333, 338 (2d Cir. 1992); see also United States v. Abbas, 418 F.Supp.2d 280, 285 (W.D.N.Y. 2006) (collecting cases); United States v. Jailall, 2000 WL 1368055m at *8 (S.D.N.Y. Sept. 20, 2000) (noting that defendant

bears the burden of showing the existence of a disputed fact that supports suppression). However, when a defendant seeks to suppress his statements on the additional grounds that such statements were involuntary made, as both Kotelsky and Gershkovich do here, in opposing the motion, "the Government bears the burden to demonstrate, by a preponderance of the evidence," that challenged statements were not obtained "under circumstances that overbore [the defendant's] will at the time it was given." Paracha, 2004 WL 1900336, at *4 (citing United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991).

### B. Kotelsky's Motion to Suppress

The Court held an evidentiary hearing on Kotelsky's suppression motion on May 4, 2011. Natalie Sotnikova ("Sotnikova"), an Agent of the Medicare Fraud Control Unit of the New York State Attorney General's Office, was the sole witness, and the Court credits her testimony in its entirety.[13]

### 1. Findings of Fact

At approximately 8:00 am on June 9, 2010, three agents working on a joint federal-state Medicare fraud investigation went unannounced to Kotelsky's one-room studio apartment in 190 Bethel Loop, Apt. 10C, in Starrett City,[14] Brooklyn, to interview her

---

[13] A native Russian-language speaker, Agent Sotnikova testified that her role during the interview was to interpret for the lead investigator, Agent O'Connor. (Kotelsky's Hearing Transcript, dated May 4, 2011 ("KH") at 17–18.) She also testified that she was told only five minutes prior to going to Kotelsky's home that they were going to interview people who might be taking money from a medical center to bring in more patients. (Id. at 33–34.)

[14] Developed under the Mitchell-Lama program in the 1960's and occupying a land area just beyond the East New York neighborhood of Brooklyn, Starrett City is one of the largest federally-subsidized

regarding her knowledge of Solstice and her role, if any, in the Center's suspected kickback scheme. (KH at 4–5, 9–10.) Sotnikova was accompanied by Daniel Connor, a Special Agent of the U.S. Department of Health and Human Services Officer of Inspector General ("HHS/OIG") and lead investigator ("Connor"), and Alexander Shaporov, a Special Investigator of New York State Office of Medicaid Inspector General ("OMIG") who, like Sotnikova also spoke Russian ("Shaporov"). (Id.) The agents did not go to Kotelsky's apartment with the intention of arresting her and left without placing her under arrest. (Id. at 11–12, 16, 32–34, 46.)

The agents arrived at Kotelsky's apartment dressed in plain clothes and, although Shaporov and Connor were armed their weapons were concealed and holstered. (KH at 13.) Kotelsky's significant other Semen Mezhiskhko ("Mezhiskhko") answered the door when the agents knocked, and he led the agents inside the apartment after they identified themselves, showed their badges and explained that they wished to speak to Kotelsky about Solstice. (Id. at 12, 15.) The agents found Kotelsky inside and again identified themselves and told her they were there only to ask her a few questions about a medical center she was attending, and would leave immediately after the questioning. (Id. at 16–17, 47.) Although Kotelsky was visibly annoyed at the agents for being in her home so early in the morning, she nevertheless agreed to the interview. (Id. at 16–17, 30.)

---

housing development in the country. It officially changed its name to Spring Creek Towers in 2002.

Before starting the interview, the agents asked Kotelsky to be truthful in her responses and warned her that untruthfulness could lead to charges being brought against her.  (KH at 17.)  The interview lasted approximately 45 minutes to an hour, and Sotnikova later memorialized it in a one-page report that was reviewed by her supervisor in the AG's Medical Fraud's Unit, Tom Burke.  (Id. at 25–26, 34–35; <u>see also</u> Government Ex. 1.)

During the interview, Kotelsky confirmed that she was familiar with Solstice and knew Dmitry to be the owner of Solstice.  (KH at 19, 21.)  Kotelsky explained that she visited Solstice because she was a very sick woman and showed the agents a bag of her medications.  (<u>Id.</u> at 19.)    She stated that no one had offered her money to go to Solstice as a patient, or offered her money to bring more patients to Solstice.  (<u>Id.</u> at 19–20.)  She also stated that she had never heard or seen any type of conduct related to kickbacks at Solstice.  (<u>Id.</u> at 20.)  At some point during the interview Kotelsky asked the agents whether she should get a lawyer.  (<u>Id.</u> at 22–23.)  Agent Sotnikova advised Kotelsky that if she was "not comfortable," she "could stop [them] at any point to get an attorney and we'll leave."  (<u>Id.</u> at 23.)  In response, Kotelsky communicated that she was comfortable with the questions and continued to cooperate.    (<u>Id.</u> at 22–23.) Kotelsky did not communicate any desire to cease the interview or request that the agents leave her home. (<u>Id.</u> at 32.)   Moreover, she offered some unsolicited details about her life including where she was from, her family, and occupation. (<u>Id.</u> at 28.) Although the agents did not specifically ask her whether or not she was feeling well,

Sotnikova recalled that Kotelsky did not appear to be incapable of answering questions, or seemed otherwise confused, scared, or nervous. (Id. at 31, 41, 45–46.) The agents did not provide her with any Miranda warnings at any time during the 45-minute to an hour interview. (Id. at 44.)

At various times during the interview Kotelsky expressly sought the agents' permission to (1) use the bathroom, (2) drink water, (3) answer her telephone, and (4) take her medication, and the agents granted every request. (KH at 26–27, 43, 47.) Additionally, towards the end of the interview, the agents showed Kotelsky three photographs—one of Dmitry, one of Kotelsky herself, and one of two men exchanging money. According to Sotnikova, Kotelsky grew annoyed at being shown these photographs and said "why are you showing me this?" (Id. at 21–22, 30.) Kotelsky also added "unless you got me on video you're wasting your time." (Id. at 22.) Agent Sotnikova further testified that she had not raised her voice at all during the interview. Finally, as Kotelsky was being questioned by Sotnikova and Connor, Shaporov questioned Mezhiskhko in a separate portion of the studio. (Id. at 28.)

2. Conclusions of Law

After a careful review of the totality of circumstances surrounding the June 9 interview and consideration of various indicia of "custody," including the five factors the Second Circuit identified in Tankleff, 135 F.3d at 244, the Court concludes that Kotelsky was not "in custody" for purposes of Miranda.[15] The Court also finds that the

_____

[15] There is no need then for the Court to address the issue of whether the interview constituted an

Government had met its burden of showing that her statements were voluntary and not the product of coercion.

First, in reaching its conclusion as to the non-custodial nature of the June 9 interview, the Court specifically relies on the following circumstances, as set forth in its findings.

- Kotelsky was questioned by agents who were in plainclothes without any visible weapons. Compare Badmus, 325 F.3d at 138–39 (affirming a no-custody finding where the district court had found that law enforcement agents had not drawn their guns during the challenged encounter) with United States v. Ali, 68 F.3d 1468, 1473 (remanding a no-custody finding and noting the fact that defendant had been surrounded by agents with visible handguns as relevant factor in the custody inquiry.)
- Kotelsky was told at the beginning of the interview that the agents would ask her a few questions, after which they would leave. See United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992) ("[d]ecisions in this circuit have emphasized that in the absence of an actual arrest, an interrogation is not 'custodial' unless the authorities[agents] affirmatively convey the message that the defendant is not free to leave); cf. United States v. Romazko, 253 F.3d 757, 760–61(2d Cir. 2001) (affirming a finding that defendant was "in-custody" where the evidentiary record showed defendant had asked agents to leave, but was told that she could not.)
- Kotelsky never indicated that she wanted to terminate the questioning. See, e.g., United States v. Lifshitz, No. 03-CR-572 (LAP), 2004 WL 2072468, at *7 (S.D.N.Y. Sept. 15. 2004) (no custody where defendant had not indicated he wanted to terminate the questioning.)
- Kotelsky did not otherwise appear that she was somehow incapable of answering questions. See. e.g., United States v. Connelly, No. 05-CR-6166 (CJS), 2007 WL 3124528, at *9 (W.D.N.Y. Oct. 25. 2007) (no custody where defendant did not appear incapable of answering questions or under the influence of illegal drugs).

---

"interrogation," for Miranda purposes. Georgesison v Donelli, 588 F.3d 145, 155-57 (2d Cir. 2009) (Miranda does not apply if the person is not in custody, even if the person is suspected of criminal activity or is a focus of the investigation); see also United States v. Pescatore, No. 04-CR-774 (TCP), 2006 WL 467948, at *3 FN 2 (E.D.N.Y. Oct. 25. 2007) (if a court finds that defendant was not in custody at the time of the challenged statements, the court need "not reach the issue of whether the questioning constituted an interrogation for Miranda purposes.")

- The interview took place in Kotelsky's home. <u>See, e.g.</u>, <u>Newton</u>, 369 F.3d at 675 ("absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial.)
- The tone of the interview was cordial, <u>see, e.g.</u>, <u>Paracha</u>, 2004 WL 1900336, at *7 (no custody where among other things law enforcement agents did not yell or raise their voices); and, at 45 minutes to an hour, it was not too long in duration, <u>see, e.g.</u>, <u>Lifshitz</u>, 2004 WL 2072468, at *8 (noting that "the interview was not overly long-lasting approximately 45 minutes to one hour," in finding no custody); <u>Paracha</u>, 2004 WL 1900336, at *8 (no custody even where defendant was questioned for approximately seven hours.)
- Despite asking asked about a lawyer, Kotelsky did not actually request one, and willingly continued to answer questions. <u>Cf.</u> <u>Paracha</u>, 2004 WL 1900336, at *9 (a defendant's questions to law enforcement agents on whether they thought he needed counsel, "in the Second Circuit have been deemed to ambiguous to trigger a defendant's right to be free from further questioning. . . .")(citations omitted).
- Finally, neither Kotelsky nor her significant other were handcuffed or otherwise restrained during the interview. <u>See, e.g.</u>, <u>Pescatore</u>, 2006 WL 467948, at *3 (no custody where defendant was not physically restrained); <u>Connelly</u>, 2007 WL 3124538, at *8 (same). Although Kotelsky makes much of the fact that she apparently felt the need to ask permission to get up and use the bathroom, get water and answer the telephone, the important facts here is she was in fact allowed to move about her apartment when she needed to do so. <u>Compare Connelly</u> 2007 WL 3124538, at *10 (finding no custody where defendant had been "permitted to use the bathroom when needed") <u>and</u> <u>Paracha</u>, 2004 WL 1900336, at*8 (no in custody where law enforcement agents had "honored," defendant's several requests for breaks) <u>with</u> <u>Badmus</u>, 325 F.3d at 139 (affirming a finding of no custody even where a defendant who was told to remain seated in his living room and was not allowed to move freely in his own home) <u>and</u> Lifshitz, 2004 WL 2072468, at *7 (no custody as to defendant who was told to wait when he sought permission from law enforcement agents to get dressed and smoke a cigarette).

Given the totality of the circumstances described above, the Court concludes that "a reasonable person in [Kotelsky's] shoes" would not have felt in custody. <u>Newton</u>, 369 F.3d at 675. Accordingly, to the extent that Kotelsky's suppression motion is based on the lack of <u>Miranda</u> warnings, the motion is DENIED.

Second, to the extent that Kotelsky's motion is based upon a due process argument that her statements were involuntary, the motion must also be DENIED. The Court finds that the Government met its burden in establishing, by a preponderance of the evidence, that Kotelsky's statements were voluntary and not the result of any physical or psychological coercion. In reaching its determination on voluntariness, the Court again relies on its findings of fact taking into account the conditions of the interview, the conduct of law enforcement officers, and Kotelsky's personal background. See generally Rugles 70 F.3d at 265; Section IV.A.2 supra.

One, with respect to the conditions of the interview, the Court notes that the interview was brief; Kotelsky was allowed to get up when she requested; she never indicated that she wanted to cease the questioning or that she did not understand the questions; and she did not appear to be under the influence of alcohol or drugs. Further, while she told the agents that she was a very sick woman, she did not complain that she was too sick for the interview. Two, with respect to the conduct of the agents, the Court finds no evidence that the agents engaged in any conduct that was so coercive—either psychological tactics or physical pressure—as to cause Kotelsky to submit to the interview or to otherwise overcome her will to resist efforts by the agents to obtain statements from her at any time during the interview. See Connelly, 2007 WL 3124528, at *10 (considering that law enforcement agents had not threatened or make any promises to get him to talk and that defendant was cooperative and

responded to the questions when asked in determining that defendant was not in custody during interview).

Finally, concerning Kotelsky's background, Kotelsky's counsel urges the Court to take into account, in its voluntariness inquiry, her client's background as a Jewish refugee who fled the former U.S.S.R. as evidence that Kotelsky was particularly vulnerable or susceptible to coercive questioning. While the Court is not unsympathetic to what may have been Kotelsky's subjective state of mind, there is no objective evidence that the June 9 interview was coercive in fact or produced such mental distress or physical exhaustion as to overcome Kotelsky's will. See generally Kabba, 999 F.2d at 51; see also Newton, 369 F.3 at 671 (observing that while any "interview of one suspected of a crime by a police officer will have coercive aspects to it," that alone is insufficient to find coercion) (citation omitted). Moreover, Kotelsky did not proffer any additional facts to overcome the credible and unrebutted testimony of Sotnikova, who testified that Kotelsky was generally cooperative and had stated that she was comfortable with the questions when asked if she wanted to proceed with the interview. See Paracha, 2004 WL 1900336, at *6–7 (finding a defendant's statements were voluntary where defendant proffered no such evidence that "the interviews he participated in were uniquely difficult or oppressive for him.")

**C. Gershkovich's Motion**

The Court held an evidentiary hearing on Gershkovich's suppression motion on May 10, 2011. The Government called two witnesses—Joe Giambalvo, Special Agent

for HHS/OIG and lead agent in Gershkovich's arrest ("Giambalvo"), and Alexander Shaporov, Medicaid Investigator for OMIG who served as a Russian-language interpreter during the arrest ("Shaporov").

1. Findings of Fact

At approximately 7:00 am on July 20, 2010, four armed state and federal agents arrived unannounced at Gershkovich's apartment to arrest him pursuant to an arrest warrant on these health-care fraud charges. (Gershkovich's Hearing Transcript, dated May 10, 2011 ("GH") at 5, 16.) Present were Giambalvo and Shaporov and two other special agents from HHS/OIC, Scott Lambert and Jason Valeco. (Id. at 5–6.)

Gershkovich was placed under arrest at 7:05 am, and transported to the courthouse for processing in the backseat of an agency vehicle, where Giambalvo and Shaporov processed him and waited with him in a small waiting room awaiting his pretrial interview. Gershkovich was not advised of his Miranda rights until approximately four hours later at 11:15 am. (GH at 17, 20, 22, 27–28.) According to both Giambalvo and Shaporov, however, they did not interrogate or otherwise question Gershkovich about the charges at any point during and following his arrest. (GH at 29.)

Giambalvo explained that he did not Mirandized Gershkovich at the time of arrest because Gershkovich's wife was agitated and he wanted to calm the situation as well as ensure that Gershkovich collected whatever medicines he needed for the day. (GH at 6, 19, 20, 21.) Giambalvo also explained that he did not Mirandized Gershkovich later during transport to the courthouse because Gershkovich asked when he would get to

see his lawyer immediately upon settling in the car, which Giambalvo interpreted as Gershkovich invoking his Sixth Amendment right to counsel.  (Id. at 7, 21–22, 32, 41.) Both Giambalvo and Shaporov testified that following Gershkovich's attorney query, Giambalvo told the agents that there will be no questioning of Gershkovich. (Id. at 7, 10.)  Additionally, Giambalvo also explained to Gershkovich that yes, he would get to see an attorney and that one would be provided for him if he didn't have one.  (Id. at 7, 8, 22, 33.)

According to both Giambalvo and Shaporov that they did not interrogate Gershkovich.  Giambalvo, in particular, testified that the only questions he asked Gershkovich that concerned Gershkovich's well-being and condition for the day, whether for example, he needed medicine, clothes to wear, food, bathroom breaks, water, the temperature of the car, etc. (GH at 6, 9, 12, 15, 26, 33, 42, 45.) Gershkovich nevertheless made a series of spontaneous statements throughout the arrest process. (GH at 9.)  First, in the car en route to the courthouse, Gershkovich offered them several details about his life including that he had spent 35 years in the Russian army, had lived in the United States for 15 years, and had heard about the warrant for his arrest on the internet and from his neighbors.  (Id. at 9, 24, 34.)  Gershkovich also asked about a Solstice tape, and volunteered that "Dmitry was the main guy and that Aleksey was just some guy in the office.  (GH at 10, 24, 34, 35, 43.)[16]  Second, while

---

[16] While there is some discrepancy between the testimony and the Giambalvo's notes, as to whether Gershkovich made this comment in the car, at the courthouse or in the car by the courthouse, this does not affect the Court's findings as both witnesses testimony that this was said, was credible. (GH at 25–

awaiting a pre-trial interview in a small waiting room, Gershkovich posed a rhetorical question asking "if a Medicare provider gives him a turkey, how is he supposed to know that [Medicare] is the source of funds. . . for the turkey." (GH at 13, 26, 36.) Giambalvo testified that he took that comment to be a potentially self-incriminating statement and thought that Gershkovich needed to be advised of his <u>Miranda</u> warnings then. (<u>Id.</u> at 13, 27.) Thus, upon Giambalvo's instruction, Shaporov provided Gershkovich with a Russian-language Miranda waiver form, which Gershkovich, after having it explained to him, declined to sign. (<u>Id.</u> at 14, 26, 28, 29, 36, 37, 38, 47.) According to both Giambalvo's and Shaporov, even after declining to sign the <u>Miranda</u> waiver form, Gershkovich volunteered yet a third set of unsolicited statements. Specifically, Gershkovich told the agents that Dmitry and Aleksey had owed him $3,000 for several years; that Kotelsky had paid him out of her own pocket because the Shteyman brothers didn't have any money; that the brothers had changed their cell phone numbers so that people like him and Kotelsky couldn't call him; that he was a recruiter like Kotelsky; that he got caught on camera because he had taken money from Aleksey, whom he had taken money from more than once; and finally, that he hadn't seen "those people' in about six months. (GH at 14, 29, 38, 49.) Both Giambalvo and Shaporov also testified that there were no comments back and forth between the agents and Gershkovich; they simply listened as Gershkovich talked. (<u>Id.</u> at 29, 46.)

26, 34–35, 52; Gov. Ex. 1.)

2.  <u>Conclusions of Law</u>

First, to the extent that Gershkovich's suppression motion is based on the lack of <u>Miranda</u> warnings, the motion is DENIED.  It is axiomatic that voluntary statements remain a proper element in law enforcement.  <u>See</u> <u>Miranda</u>, 384 U.S. 436 at 478.  The Second Circuit has observed "as Miranda itself recognized. . .volunteered statements of any kind are not barred by the Fifth Amendment and thus, do not require preliminary advice of rights. . . .[moreover] even if a defendant has asserted his Fifth Amendment right to counsel, if the defendant himself initiates further communication with law enforcement, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial."  <u>United States v. Rommy</u>, 506 F.3d 198, 132 (2d Cir. 2007), <u>cert. denied</u>, 128 S.Ct. 1681 (2001 (alteration, quotation and citations omitted.)  Here, both Government's witnesses testified that Gershkovich's statements were unprompted and spontaneous, and the Court found their testimony credible and essentially unrebutted. Additionally, they also testified that the only questions they asked Gershkovich concerned his well-being—not the sort of interrogatory questions that raise the drawbridge of <u>Miranda</u>.  <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S 291, 201 (1980) (<u>Miranda</u> is not implicating where police questions or practice are not of the sort that that the police should know would reasonably likely "evoke an incriminating response from a suspect thus amounts to interrogation."); <u>cf</u>.  <u>United States v. Gotchis</u>, 803 F.2d 74, 79 (2d Cir. 1986) (finding routine questions about a suspect's identity did not implicate

<u>Miranda</u>).  Moreover, the fact that Gershkovich refused to sign a <u>Miranda</u> waiver form indicates that he understood his right to remain silent, but nevertheless chose to forfeit that right by continuing to make spontaneous statements.  <u>See, e.g.</u>, <u>Colon v. Ercolve</u>, No. 09 Civ. 5168 (LTS) 2010 WL 9401 at *27 (S.D.N.Y. Jan. 4, 2010); ("The fact that a suspect chooses to speak after being informed of his rights is [] highly probative.")  Finally, even assuming arguendo that Gershkovich's statement in the car was an unambiguous request for a lawyer, the Court needs not engage in a Sixth Amendment analysis, as it finds Gershkovich was not interrogated while in custody. <u>Davis v. United States</u>, 512 U.S. 452, 457 (1994).

Second, to the extent Gershkovich's suppression motion is based upon the involuntariness of his statements, the motion must also be DENIED.  Having considered the totality of the circumstances, including his background, the conditions of his arrest and post-arrest processing, and the conduct of the arresting agents, the Court finds that the Government more than met its burden of showing that all of Gershkovich's statements were voluntary.  One, there is no evidence that Gershkovich is of below-average intelligence or that something in his background made him particularly vulnerable or susceptible to being questioned about his well-being and condition,  <u>United States v. Egipciaco</u>, 389 F.Supp.2d 520, 525–26 (S.D.N.Y. 2005) (finding statements voluntary based in part upon such defendant's characteristics).  Two, during and following arrests he was offered food, water, and bathroom breaks.  Finally, Gershkovich made no allegations of any mistreatment or presented any

evidence whatsoever that the law enforcement agents had acted inappropriately.  <u>Cf.</u>, <u>e.g.</u>, <u>Anderson</u>, 929 F.2d 96, 101–02 (2d Cir. 1991) (holding inculpatory statements involuntary where government agents gave defendant misleading legal advice resulting in the confession); <u>Ruggles</u> 70 F.3d at 765 ("Material misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will.")

For reasons delineated above both Kotelsky's and Gershkovich's motions to suppress statements are DENIED.


## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' pre-trial motions are DENIED in part and GRANTED in part.

SO ORDERED.


DATED:     May 23, 2011         _____/s/_____
            Brooklyn, New York       Sterling Johnson, Jr., U.S.D.J.